UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GREGREY FETSCH,                                              6:11-cv-6343-TC

Plaintiff,

v.                                        OPINION AND ORDER

CITY OF ROSEBURG, et al.,

Defendants.

COFFIN, Magistrate Judge:

The genesis of this case traces to the City of Roseburg Police Department's internal

investigation into, first, an alleged extra marital affair between plaintiff and a possible subordinate

in the Roseburg Police Department reserve officer program in October of 2010. At the time of the

affair, plaintiff was the coordinator of the reserve officer program. The department placed plaintiff

on paid leave while it conducted the investigation. However, after the department concluded that

the affair did not take place until after the purported subordinate was no longer interested in the

reserve program and was no longer an applicant in the program, the investigation then focused on

plaintiff sharing detailed information about the affair with a police officer whom plaintiff supervised,

Page 1 - OPINION AND ORDER

making the officer uncomfortable.

The department's investigating officer concluded that plaintiff had engaged in misconduct by sharing the information with the officer he supervised and requesting the information be kept secret. The investigating officer concluded that plaintiff had placed undue pressure and stress on the lower ranking officer and called into question plaintiff's supervisory abilities. More, importantly, the investigating officer concluded that plaintiff had not been candid and honest during the investigation. The Roseburg Chief of Police, Jim Burge, reviewed the investigation report and concluded that plaintiff should be terminated and notified plaintiff of his intent to impose such discipline on November 1, 2010. Burge met with plaintiff on November 3, 2010, and Roseburg Police Captain Jeffrey Matthews later informed plaintiff of Burge's decision to terminate.

On November 4, 2010, Burge gave plaintiff about 90 minutes to decide whether he wanted to be fired or resign. During the week of November 1, 2010, plaintiff twice requested an additional week to decide whether to resign and requested time to consult with an attorney. Plaintiff's requests were denied and on November 4, 2010, plaintiff resigned.

The Roseburg police Department notified the Department of Public Safety Standards and Training (DPSST) of plaintiff's resignation on November 5, 2010, and on November 8, 2010, provided a copy of the investigation report. Between December 15, 2010, and October 28, 2011, plaintiff repeatedly requested of Roseburg legal counsel, through his counsel, a hearing, asserting his due process rights had been violated. Roseburg legal counsel, Aiken Blitz, did not agree that plaintiff was entitled to a name-clearing hearing.

In June of 2011, Roseburg Human Resources Director, John Van Winkle, after consulting with legal counsel Aiken Blitz, provided a copy of the notice of intent to impose discipline to the

Page 2 - OPINION AND ORDER

News-Review of Douglas County. On July 28, 2011, the News-Review published an article stating, among other things, that Chief Burge determined plaintiff lacked candor, forthrightness and honesty during the investigation. Plaintiff requested a name-clearing hearing after publication, but was not offered one until October 28, 2011 (three months after publication of the article), at which time plaintiff was in Afghanistan. On July 29, 2011, the newspaper published another article repeating that the Roseburg Police Department concluded that plaintiff was not honest during the investigation.

In February of 2013, the parties tried to a jury plaintiff's claim that defendant violated his right to due process when it released a Notice of Intent to Impose Discipline on plaintiff (which included findings that plaintiff had been dishonest during an internal investigation) to a newspaper without first offering plaintiff a name-clearing hearing.[1] At the close of evidence, defendant moved for judgment as a matter of law under Rule 50. I denied the motion. The jury returned a verdict in plaintiff's favor for $750,000 in non-economic damages. Before me is defendant's renewed motion for judgment as a matter of law, or, in the alternative, for new trial or remittitur. (#115).

## I.    Motion for Judgment as a Matter of Law

Judgment as a matter of law is "proper if the evidence permits only one reasonable conclusion as to the verdict" and that conclusion is contrary to the jury's verdict. Shakey's Inc. V. Covalt, 704 F.2d 426, 430 (9th Cir. 1983). If substantial evidence supports the jury's finding, the court must uphold the verdict. Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir. 2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." Id. In making this

---

[1] I granted summary judgment in favor of defendants with regard to plaintiff's other claims on December 31, 2012. (#52)

Page 3 - OPINION AND ORDER

determination, the court must not weigh the evidence, but instead must consider whether the plaintiff presented sufficient evidence to support the jury's verdict. Id. at 1227-28.

A.      **Municipal Liability**

Defendant argues that plaintiff failed to establish at trial that Human Resources Director John Van Winkle had final policy-making authority with regard to the City's public disclosure of the Notice of Intent to Impose Discipline without first offering plaintiff a name-clearing hearing. After hearing evidence at trial, I found, as a matter of law, that Van Winkle was a decision maker with final authority to decide to release the notice of discipline to the newspaper. (#110). Accordingly, defendant's motion regarding municipal liability is more akin to a Rule 60 motion for reconsideration than a Rule 50 renewed motion for judgment as a matter of law. Applying either the Rule 50 or the Rule 60 standard, however, I reach the same result and deny defendant's motion with regard to municipal liability.

At trial, plaintiff testified that he received the Notice of Intent to Impose Discipline on November 1, 2010, and the Notice directed him to meet with Roseburg Police Chief Jim Burge the next day to discuss proposed discipline. (Fetsch Tr. 48:18-25;49:1-11). The Police Department denied plaintiff's request for an additional week to prepare for the meeting with Chief Burge. (Id. at 51:11-18). Plaintiff's meeting with Burge lasted twenty-five minutes, and he was not allowed to review the investigation notes or interview witnesses and was not represented by counsel. (Id. 52:2-17). Plaintiff testified that on the day of his termination, he asked for a hearing–although he did not use the terms "due process or name-clearing hearing"–in a text message to Roseburg Police Lieutenant Moore asking if "[he] could appeal to the city manager." (Id. at 54:13-22; Blitz Tr. 20:8-13).

Page 4 - OPINION AND ORDER

Shortly after separating from employment, plaintiff retained counsel. His counsel made numerous requests to the City for a hearing. In a December 2010 letter to the City's lawyer, Aiken Blitz, plaintiff's counsel requested a hearing and "referred to due process generally." (Blitz Tr. 6:8-9). Blitz testified that he was "confused" about what kind of hearing plaintiff's counsel sought; he understood the letter to request a due process hearing but thought it was a request for a "post-deprivation hearing." (Id. 7:17-19-8:4-6). Plaintiff's counsel sent another letter to Blitz requesting a hearing in January of 2011 and the two also communicated about a hearing by email. (Id. at 9:7-20). In February 2011, plaintiff's counsel sent Blitz a third letter, and this letter specifically mentioned a "liberty interest" in the third paragraph. (Id. 18:17-25; 19:1-2; 23:13-20). In March 2011, Blitz denied plaintiff's counsel's hearing requests. (Id. at 10:20-25;11:1). After Blitz denied plaintiff's hearing request, his counsel continued to send letters asserting plaintiff's right to a hearing and requesting a hearing. (Id. at 11:19-25; 12:1).

Van Winkle, the City's Human Resources Director, was copied on a number of the letters between plaintiff's counsel and Blitz. (Van Winkle Tr. 10:14-23). Van Winkle testified that, while he did not "remember specific conversations," he would have discussed plaintiff's request for a hearing each time the City received a letter requesting a hearing if it was a "current activity" at his weekly meeting with City Manager Eric Swanson. (Id. at 12:8-19; 13:13-20). Van Winkle testified that he and the City Manager did not "make any decisions in terms of whether [plaintiff] was entitled to a hearing" but instead "operated based on legal advice that if our attorney lets us know this makes sense to do, then it makes sense to do it." (Id. 12:23-25; 13:1-12). When pressed whether someone at the City made a decision about offering plaintiff a hearing, Van Winkle stated: "yeah, I would say, again, Mr. Swanson and I had discussed the issue and the idea that the current advice is that this is

or is not appropriate to move forward with at this time." (Id.)  When VanWinkle received the information request from the newspaper, he consulted Blitz.  Despite both Blitz's and Van Winkle's knowledge of plaintiff's numerous requests for a hearing, they did not discuss giving plaintiff a hearing before releasing the information, and neither suggested consulting Swanson about offering a hearing.  Van Winkle testified that he did not see a need to consult with Swanson or anyone else at the City before releasing the Notice of Intent to Impose Discipline.  (Id. at 12-25).

Defendant argues that, under the City Charter, "no final policy making authority is vested in the City's Human Resources Director," and thus Van Winkle did not have final policy- making authority with regard to offering name-clearing hearings.  (#117 at 4).

Congress did not intend local governments to be held liable under section 1983 unless action pursuant to official government policy of some nature caused a constitutional tort."  Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978).  A local government may be responsible for a single decision by government policymakers under appropriate circumstances.  Where a decision to adopt a particular course of action is properly made by that government's authorized decisionmakers, it represents an act of official government "policy" as that term is commonly understood.  Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986).  Where action is directed by those who establish governmental policy, the local government is equally responsible whether that action is to be taken only once or to be taken repeatedly.  See, id.  However, not every decision by governmental officers automatically subjects the government to section 1983 liability.  Government liability attaches only where the decisionmaker possesses final authority to establish government policy with respect to the action ordered.  Id.  The fact that a particular official, even a policymaking official, has discretion in the exercise of particular functions does not, without more, give rise to government liability based

Page 6 - OPINION AND ORDER

on an exercise of that discretion.  The official must also be responsible for establishing final

government policy respecting such activity before the City can be held liable.  See, id. at 482-83.

> "As with other questions of state law relevant to the application of federal law, the
> identification of those officials whose decisions represent the official policy of the
> local governmental unit is itself a legal question to be resolved by the trial judge
> before the case is submitted to the jury.  Reviewing the relevant legal materials,
> including state and local positive law, as well as " 'custom or usage' having the force
> of law," Praprotnik, supra, at 124, n. 1, 108 S.Ct., at 924, n. 1, the trial judge must
> identify those officials or governmental bodies who speak with final policymaking
> authority for the local governmental actor concerning the action alleged to have
> caused the particular constitutional or statutory violation at issue. Once those officials
> who have the power to make official policy on a particular issue have been identified,
> it is for the jury to determine whether their decisions have caused the deprivation of
> rights at issue by policies which affirmatively command that it occur, see Monell,
> 436 U.S., at 661, n. 2, 98 S.Ct., at 2020, n. 2, or by acquiescence in a longstanding
> practice or custom which constitutes the "standard operating procedure" of the local
> governmental entity. See Pembaur, supra, at 485-487, 106 S.Ct., at 1301-1302
> (WHITE, J, concurring)."

Jett v. Dallas Independent School Dist., 491 U.S. 701, 737 (1989).

For purposes of Monell liability, the term "policy" includes within its definition not only

policy in the ordinary sense of a rule or practice applicable in many situations.  It also includes "a

course of action tailored to a particular situation and not intended to control decisions in later

situations." Pembaur, 475 U.S. at 481. When determining whether an individual has final

policymaking authority, courts ask whether he has authority "in a particular area, or on a particular

issue." McMillian v. Monroe County, 520 U.S. 781, 785 (1997).  For a person to be a final

policymaker, he must be in a position of authority such that a final decision by that person may

appropriately be attributed to the City.

To determine whether the decisionmaker is a final policymaker, the court looks first to state

law. Jett, 491 U.S. at 737.  A Roseburg City employee may act as a de facto policymaker under

section 1983 without explicit authority under state law, but courts are ordinarily "not justified in assuming that [City] policymaking authority lies somewhere else than where the applicable law purports to put it." City of St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988). Depending on the circumstances, however, courts may also look to the way a local government entity operates in practice. Jett, 491 U.S. at 737 (trial judge must identify official policymakers based on "state and local positive law, as well as custom or usage having the force of law") (citation and quotation marks omitted). While "[a]uthority to make [City] policy may be granted directly by a legislative enactment," it may also be "delegated by an official who possesses such authority." Pembaur 475 U.S. at 483.

While the evidence here does not clarify the City's "official chain of authority" for granting a name-clearing hearing, it does establish that, in this instance, Van Winkle's decision to release information without a hearing fairly represented official policy. Pembaur v. Cincinnati, 475 U.S. 469, 480 (1986) (municipal liability may be imposed for a single decision under the right circumstances).

The Roseburg City Charter vests power in the City Council except where the Charter provides to the contrary. Roseburg City Charter, 98.2.1(1). Nothing in the Charter or the Roseburg Municipal Code prohibits the Council from delegating any of its powers. Moreover, there are no specific provisions related to discipline of the City's police officers or the authority to grant any due process hearings or to release termination information. In addition, state law regarding the organization and government of cities is silent as to where the authority to grant a name-clearing

hearing rests.[2]  See O.R.S. Chapter 221.  Accordingly, the court looks to the way the City operates

and practices.  Given that neither the statutes nor the City Council set any parameters to govern

decisionmaking with respect to when and how to grant a name-clearing hearing, Van Winkle, in

consultation with Blitz, if not explicitly authorized to make policy in this area, had unfettered

discretion to make the decision and in effect was a policymaker.  See Valentino v Village of South

Chicago Heights, 575 F.3d 664, 678-79 (7th Cir. 2009) (with no laws, statutes or ordinances placing

policy setting authority in an area, combined with unfettered discretion to act in that area, results in

policymaking authority).

Although, Swanson testified that Van Winkle lacked the authority to decide whether to offer

a name-clearing hearing, Van Winkle's testimony established that he and Swanson discussed

whether to offer a name-clearing hearing and decided, based on the advice of the City's attorney,

not to offer plaintiff a hearing.  Later, when he received the request from the newspaper to release

the Notice of Intent to Impose Discipline, Van Winkle discussed the request with Blitz and, despite

being aware of plaintiff's numerous requests for a name clearing hearing, felt comfortable releasing

the information without consulting with Swanson or any other city official.  Further, Van Winkle's

job responsibilities include "assist[ing] the City Manager in formulating policies and procedures for

departmental organization and operation," establishing that Van Winkle has the authority to establish

the City's policies.  (#129, ex. 3, pg. 1).  In short, the evidence here–Van Winkle's involvement in

deciding whether to offer a hearing, his authority to release information to the newspaper without

---

[2]Oregon State statutes do generally provide for what safeguards a public safety officer
must be afforded when facing termination.  O.R.S. § 236.360(2).  The statute does not address
who, at the city level, has policymaking authority in this area.  Indeed, the statute requires
employers of public safety officers to adopt written procedures to implement these provisions.
O.R.S. § 236.360(1).

Page 9 - OPINION AND ORDER

consulting Swanson or the City Council and the formal description of his job responsibilities–establish that Van Winkle was a final policy maker with respect to whether to release the Notice of Intent to Impose Discipline without first offering a hearing. <u>Pembaur</u>, 475 U.S. at 481-83.

I find no reason to reconsider my earlier ruling regarding municipal liability (#100), and I find that plaintiff presented sufficient evidence to support this finding.

**B.      Publication in the Course of Termination**

Defendant next argues that the evidence viewed in a light most favorable to plaintiff, was insufficient to establish that the City's disclosure of the stigmatizing statements was in the course of plaintiff's termination because it occurred seven months after plaintiff's resignation. The Ninth Circuit has declined to adopt a bright-line rule that "defamatory statements made by an employer anytime after the date of termination are not made in the course of termination." <u>Campanelli v. Bockrath</u>, 100 F.3d 1476, 1480 (1980). Instead, the Circuit has concluded that statements need only be "so closely related to the discharge from employment that the discharge itself may become stigmatizing in the public eye." <u>Id.</u> at 1482. Defendant argues, however, that the time between the termination and the defamatory statements in <u>Campanelli</u> was only eight days, and that the Ninth Circuit subsequently held in <u>Tibbetts v. Kulongoski</u> that a press release issued nineteen days after termination was too remote in time to trigger the right to a name clearing hearing. <u>Tibbetts</u>, 567 F.3d 529, 537-38 (9th Cir. 2009).

Here, unlike in <u>Campanelli</u> and <u>Tibbetts</u> where the stigmatizing statements were made after termination, the City made the stigmatizing statements about plaintiff at the time of his termination. The statements about plaintiff's alleged dishonesty were included in the Notice of Intent to Impose

Page 10 - OPINION AND ORDER

Discipline which formed the basis for his forced resignation. In other words, the City made the stigmatizing statements when plaintiff was terminated but publicly released the statements seven months later. Based on these facts, I find that the statements were so closely related to the discharge (indeed, the statements formed the basis for the discharge) that "the discharge itself [became] stigmatizing in the public eye." Campanelli, 100 F.3rd at 1482.

Moreover, as detailed at length above, plaintiff asked for a hearing on the day of his termination and made several subsequent requests for a hearing before July 2011 when the City released the stigmatizing information. If I were to adopt the City's line of reasoning, a public employer could evade its duty to provide a name-clearing hearing by ignoring a former employee's hearing requests and delaying publication of stigmatizing information until some later date when the publication would, in its view, be too remote in time to implicate the right to due process. Such a tactic renders wholly illusory the Fourteenth Amendment's due process guarantees.

### C. Stigma Plus

Defendant argues that plaintiff did not produce sufficient evidence that the stigmatizing statement resulted in the denial of a tangible employment interest because plaintiff did not show proof of actual damage to his reputation or employment opportunities. I disagree.

To succeed on a stigma-plus claim, plaintiff must establish that he (1) suffered from stigma (i.e., loss of reputation); (2) suffered an additional injury (the "plus" element) that was "directly caused by the [City], rather than an injury caused by the act of some third party [in reaction to the City's defamatory statements]"; and (3) he received inadequate process. American Consumer Pub. Ass'n, Inc. v. Margosian, 349 F.3d 1122, 1125–26 (9th Cir.2003); see also Paul v. Davis, 424 U.S.693, 701, 711 (1976); Zutz v. Nelson, 601 F.3d 842, 849 (8th Cir.2010); Monserrate v. New

Page 11 - OPINION AND ORDER

York State Senate, 599 F.3d 148, 158–59 (2d Cir.2010) ("adequate process defeats a stigma-plus claim"); Little v. City of North Miami, 805 F.2d 962, 969 (11th Cir.1986) (holding that § 1983 due process claim was sufficiently pled based on allegations that city council issued its censure of the plaintiff law professor without any notice or a hearing). During the trial, Chief Burge admitted that a public allegation of a police officer's dishonesty was like a "scarlet letter" and that he would not hire an applicant who had been charged with dishonesty. (# 129, ex. 5, pg. 2). Sheriff John Hanlin testified that he would not hire a dishonest police officer and that "honesty is one of the cornerstones for a position in law enforcement." (Id. ex. 6, pgs. 2-3). Plaintiff also introduced evidence that he was unable to find employment in Douglas County and had to resort to employment opportunities in Afghanistan. I find that this evidence is sufficient to support a finding that the City's publication of allegations of plaintiff's dishonesty precluded plaintiff from finding work in law enforcement in Oregon.

## II.      Motion for New Trial or Remittitur

### A.      Error in Evidentiary Ruling

Defendant argues that it is entitled to a new trial based on the court's error in allowing plaintiff to introduce evidence that the Oregon Department of Safety Standards and Training (DPSST) made a final determination that plaintiff had not been dishonest during the Roseburg Police Department's internal investigation. Defendants sought to exclude this evidence in a motion in limine, which I denied. Defendant now argues that the DPSST's determination that plaintiff was honest in the internal investigation was not relevant to any issue in the case. Specifically, defendant argues that DPSST's determination had no relevance regarding whether plaintiff had been honest during the internal affairs investigation.

The DPSST certifies law enforcement officers in Oregon and, without DPSST certification, it is impossible to work in law enforcement in Oregon. After plaintiff's resignation, the DPSST notified him it was beginning proceedings to revoke his certifications and plaintiff appealed. As part of his appeal, the DPSST offered plaintiff a hearing regarding the underlying investigation and ultimately voted not to revoke his certification based on its finding he had not been dishonest. Here, the DPSST finding was relevant to an element of plaintiff's claim–that the City published a stigmatizing false statement, a fact the City disputed. Further, the DPSST proceedings were relevant to the issue of whether, had the City offered him a hearing, it might have concluded that plaintiff was not dishonest during the internal investigation. Indeed, the jury instructions at the conclusion of the case informed the jury that the very purpose of a name-clearing hearing is "to allow the employee to clear his name so the allegedly false and stigmatizing statements do not interfere with his ability to work in his own profession." Instructions (#97) at p. 22. Like the DPSST, Burge did not participate in the internal investigation. Burge based his decision to impose discipline on plaintiff (including the critical finding of dishonesty) on the "facts, findings and conclusions" in the internal investigation and his "review of the entire investigative finding." (#38, ex. 14). The only difference in the DPSST's review was that it offered plaintiff a hearing. The DPSST's findings were relevant to plaintiff's continued assertion that a hearing would have revealed that he was not dishonest during the internal investigation. Accordingly, I find that this evidence was relevant under Fed. R. Evid. 402 and properly admitted.[3]

---

[3]I note that Chief Burge's finding that plaintiff had been dishonest in the internal investigation was in essence an opinion that was formed by his "review of the entire investigative finding." DPSST's opposite conclusion was likewise an opinion formed by its independent review, which included plaintiff's response, after being provided a meaningful opportunity to be heard concerning the report considered by Chief Burge.

Page 13 - OPINION AND ORDER

Defendant argues that, even if relevant, the DPSST determination was unduly prejudicial. Specifically, defendant argues that the jury might have been unable to make its own conclusions about whether plaintiff had been dishonest after hearing that the DPSST determined he had been honest. This argument is not persuasive. The DPSST determination was not dispositive of the ultimate issue before the jury–whether defendant violated plaintiff's Fourteenth Amendment due process rights by not offering him a name clearing hearing before publicly releasing stigmatizing information which was false. Gilchrist v. Jim Slemons Imports, Inc., 803 F.2d 1488, 1500 (9th Cir. 1986). Plaintiff did not offer evidence of the DPSST determination that he had been honest during the internal investigation in a vacuum. Defendant offered ample evidence that plaintiff was dishonest during the internal investigation, including the results of the investigation and testimony of witnesses and decision makers involved in the investigation. Moreover, the jury heard audio tapes of the actual interviews of plaintiff by the officers conducting the internal investigations and was fully apprised of the specifics of the questions asked and the answers given by plaintiff. Although the jury heard evidence that DPSST found that plaintiff had not been dishonest in the internal investigation, they also heard the contrary opinions of Chief Burge and Lieutenant Moore that he had been dishonest. At bottom, the jury made its own finding after hearing all the evidence on that issue.[4] I find that admitting the DPSST finding was not unduly prejudicial.

**B.    Error in Jury Instruction**

_____

[4]In pertinent part, the jury was instructed that "... the plaintiff must prove the following additional elements by a preponderance of the evidence: 1. The statements defendant publicly disclosed were stigmatizing; 2. The stigmatizing statement was made in the course of the plaintiffs termination of employment; 3. The stigmatizing statement was substantially false; 4. The plaintiff contested the accuracy of the stigmatizing statement; and 5. Defendant denied plaintiff a meaningful opportunity to rebut the charges made against him and clear his name through a name-clearing hearing. Instructions (#97) at p. 18.

Page 14 - OPINION AND ORDER

Defendant argues that the jury instructions erroneously failed to include the "stigma plus" element of plaintiff's claim and thus did not correctly state the law. Jury instructions must fairly and adequately cover the issues presented, must correctly state the law and must not be misleading. Clem v. Lomeli, 566 F.3d 1177, 1180 (9th Cir. 2009). As noted above, to succeed on a stigma-plus claim, a plaintiff must establish that he (1) suffered from stigma (i.e., loss of reputation); (2) suffered an additional injury (the "plus" element) that was "directly caused by the [City], rather than an injury caused by the act of some third party [in reaction to the City's defamatory statements]"; and (3) he received inadequate process. American Consumer Pub. Ass'n, Inc., 349 F.3d at 1125–26. Here, I gave a separate stigmatizing statement element instruction, which stated:

> A statement is stigmatizing if it might seriously damage the terminated employee's standing and associations in his community, or if it imposes a stigma or other disability on the terminated employee that forecloses his freedom to take advantage of other employment opportunities. A statement that impairs a terminated employee's reputation for honesty or morality is stigmatizing.

(#97). The instructions correctly stated the elements of a liberty interest claim and instructed the jury that plaintiff must prove that he suffered damage to a tangible interest. The jury instructions required plaintiff to prove more than he was defamed and not afforded a hearing, as required in a liberty interest claim. American Consumer Pub. Ass'n, Inc., 349 F.3d at 1125-26.

## C.    Excessive Jury Verdict

Finally, defendant argues that I should order a new trial unless plaintiff accepts a remittitur because the jury's award was excessive. Defendant suggests a remittitur of not more than $100,000.

In reviewing a damages award, the court must consider the evidence of damages in a light most favorable to the prevailing party. Seymour v. Summa Vista Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir.1987), opinion amended on other grounds, 817 F.2d 609 (9th Cir.1987). Emotional distress

Page 15 - OPINION AND ORDER

damages may be awarded based on testimony alone or appropriate inference from circumstances. Passantini v. Johnson & Johnson Consumer Products, 212 F.3d 493, 513 (9th Cir. 2000).

Here, plaintiff's wife testified about the emotional distress he suffered after the published newspaper article. She noted he "was tearful, ashamed, really upset, lost his appetite" and noted that he was in a deep depression." (#116, ex. 3, p. 6-7). Plaintiff's close friend Lee Willis testified that plaintiff was "beat up pretty bad by this article" and discussed plaintiff's experiences working in Afghanistan. (#116, ex. 3, p. 11-12). Plaintiff testified that he suffered humiliation, anxiety and embarrassment after the newspaper article. (#129, ex. 7 p. 2). He testified about the hardship of leaving his family behind to work in Afghanistan, and about the emotional hardship of working in a war zone, carrying a machine gun wherever he goes, "worrying about car bombs and Talibans." (Id. at p. 6). Plaintiff testified that he was not the same fun loving guy that he was and about the hardship of not being able to watch his son play sports in person or see his daughter dance. (Id. at 7). Plaintiff specifically testified that he believed that he was in his current situation because "they called me a liar." (Id. at 6). The evidence also showed that plaintiff had repeatedly asked for a hearing and that the City declined to offer him a hearing until after the newspaper article was published.

I conclude that this evidence supports the damages the jury awarded in this case and is not shocking to the conscious or excessive. Accordingly, I decline to grant a new trial on the basis of an excessive jury award or to order a remittitur.

## Conclusion

For the reasons stated above, I deny defendant's motion (#115).

DATED this _____ day of June 2013.

THOMAS M. COFFIN
United States Magistrate Judge

Page 17 - OPINION AND ORDER